IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

UNITED STATES OF AMERICA

v.

AMBERLI SINANI

Defendant.

Criminal No.:  ELH-16-0119
Related Civil No.: ELH-18-2124

**MEMORANDUM OPINION**

Amberli Sinani filed a pro se motion for compassionate release, pursuant to 18 U.S.C. 3582(c)(1)(A)(i). ECF 426. The government opposes the Motion. ECF 433. Sinani has replied (ECF 435) and filed a supplement to his motion. ECF 436.  I shall refer to ECF 426, ECF 435, and ECF 436 collectively as the "Motion for Compassionate Release" or the "Motion."[1]

Sinani has also filed several other motions: "Motion for Court to Intervene on Behalf of Movant to Obtain his Legal Document from Attorney Paul Kramer" (ECF 437, "Motion for Legal Documents"); "Motion to Dismiss Indictment" (ECF 443, "Motion to Dismiss"); "Emergency Motion for Bond Pending Motion to Dismiss Indictment" (ECF 444, "Motion for Bond"); "Motion for Default Judgment" (ECF 447); and "Motion for Clerk's Default" (ECF 450).

No hearing is necessary to resolve the motions. For the reasons that follow, I shall deny the motions.

## I.  Background

In a multi-count, multi-defendant Indictment filed on April 12, 2016, Sinani was charged in Count One with conspiracy to distribute and possess with intent to distribute one kilogram or

---

[1] The Federal Public Defender declined to supplement the motion or to represent Sinani. ECF 430.

more of heroin, in violation of 21 U.S.C. § 846. *See* ECF 76. Of the eleven defendants named in the Indictment, Sinani was the only defendant who proceeded to trial.

The trial began on January 23, 2017. ECF 251. Several codefendants testified for the government at the trial and implicated the defendant in the conspiracy. Text messages and recorded, wiretapped telephone conversations were also introduced. In addition, Sinani testified in his own behalf. On February 2, 2017, after deliberating for about ten to fifteen minutes, the jury returned a verdict of guilty. *See* ECF 265 (Verdict); ECF 377 (Sentencing transcript) at 8.

Sentencing was held on April 13, 2017. ECF 335. Notably, the offense carried a congressionally mandated minimum term of imprisonment of 120 months and a maximum term of life imprisonment. 21 U.S.C. § 841(a)(1), (b)(1)(A). Sinani's advisory sentencing guideline range called for a period of incarceration of 121 to 151 months. *See* ECF 343 (Statement of Reasons) at 1. The government recommended a prison sentence of 144 months. ECF 377 at 19. But, the Court imposed a sentence of 125 months' incarceration. ECF 342.

Sinani timely filed a Notice of Appeal. ECF 339. On February 7, 2018, the United States Court of Appeals for the Fourth Circuit affirmed the conviction and the sentence in an unpublished, per curiam opinion. ECF 392; *see United States v. Sinani*, 710 Fed. App'x 601 (per curiam).

Defendant subsequently filed for post-conviction relief under 28 U.S.C. § 2255 (ECF 397), and he also moved for a sentence reduction under 18 U.S.C. § 3582(c)(2). *See* ECF 395. By Memorandum Opinion and Order of July 1, 2019 (ECF 418, ECF 419), I denied the motions. The Fourth Circuit affirmed on February 15, 2018. ECF 479.

Sinani, who is now 34 years old, is serving his sentence at Coleman Low FCI. *See* Bureau of Prisons, Inmate Locater, https://www.bop.gov/inmateloc/. He has served about 56 months of his sentence, or roughly 45%. Sinani has a projected release date of September 16, 2025. Bureau

of Prisons, Inmate Locater, https://www.bop.gov/inmateloc/. The government does not dispute that Sinani has exhausted his administrative remedies. ECF 433 at 1.

## II.  Standard of Review

Ordinarily, a court "may not modify a term of imprisonment once it has been imposed." 18 U.S.C. § 3582(c); *see United States v. Chambers*, 956 F.3d 667, 671 (4th Cir. 2020); *United States v. Jackson,* 952 F.3d 492, 495 (4th Cir. 2020); *United States v. Martin*, 916 F.3d 389, 395 (4th Cir. 2019).  But, "the rule of finality is subject to a few narrow exceptions." *Freeman v. United States*, 564 U.S. 522, 526 (2011).  One such exception is when the modification is "expressly permitted by statute."  18 U.S.C. § 3582(c)(1)(B); *see Jackson*, 952 F.3d at 495.

Commonly termed the "compassionate release" provision, 18 U.S § 3582(c)(1)(A)(i) provides a statutory vehicle to modify a defendant's sentence.  Section 3582 was adopted as part of the Sentencing Reform Act of 1984.  It originally permitted a court to alter a sentence only upon a motion by the Director of the BOP.  *See* Pub. L. No. 98-473, § 224(a), 98 Stat. 2030 (1984).  Thus, a defendant seeking compassionate release had to rely on the BOP Director for relief.  *See*, *e.g.*, *Orlansky v. FCI Miami Warden*, 754 F. App'x 862, 866-67 (11th Cir. 2018); *Jarvis v. Stansberry*, No. 2:08CV230, 2008 WL 5337908, at *1 (E.D. Va. Dec. 18, 2008) (denying compassionate release motion because § 3582 "vests absolute discretion" in the BOP).

However, for many years the safety valve of § 3582 languished.  The BOP rarely filed motions on an inmate's behalf.  As a result, compassionate release was exceedingly rare.  *See Hearing on Compassionate Release and the Conditions of Supervision Before the U.S. Sentencing Comm'n* 66 (2016) (statement of Michael E. Horowitz, Inspector General, Dep't of Justice) (observing that, on average, only 24 inmates were granted compassionate release per year between 1984 and 2013).

In December 2018, Congress significantly amended the compassionate release mechanism when it enacted the First Step Act of 2018 ("FSA").  *See* Pub. L. 115-391, 132 Stat. 5239 (2018); *see United States v. McCoy*, 981 F.3d 271, 276 (4th Cir. 2020).  As amended by the FSA, 18 U.S.C. § 3582(c)(1)(A) permits a court to reduce a defendant's term of imprisonment "upon motion of the Director of [BOP], or upon motion of the defendant after the defendant has fully exhausted all administrative rights to appeal a failure of the [BOP] to bring a motion on the defendant's behalf or the lapse of 30 days from the receipt of such a request by the warden of the defendant's facility," whichever occurs first.  So, once a defendant has exhausted his administrative remedies, he may petition a court directly for compassionate release.  *McCoy*, 981 F.3d at 276.

Under § 3582(c)(1)(A), the court may modify the defendant's sentence if, "after considering the factors set forth in section 3553(a) to the extent that they are applicable," it finds that

> (i) extraordinary and compelling reasons warrant such a reduction;

> (ii) the defendant is at least 70 years of age, has served at least 30 years in prison, pursuant to a sentence imposed under section 3559(c), for the offense or offenses for which the defendant is currently imprisoned, and a determination has been made by the Director of the Bureau of Prisons that the defendant is not a danger to the safety of any other person or the community, as provided under section 3142(g);

> and that such a reduction is consistent with applicable policy statements issued by the Sentencing Commission . . . .

Accordingly, in order to be entitled to relief under 18 U.S.C. § 3582(c)(1)(A)(i), the defendant must demonstrate that (1) "extraordinary and compelling reasons" warrant a reduction of his sentence; (2) the factors set forth in 18 U.S.C. § 3553(a) countenance a reduction; and (3) the sentence modification is "consistent" with applicable policy statements issued by the Sentencing Commission.

Notably, "Section 3582(c)(1)(A)(i) does not attempt to define the 'extraordinary and

compelling reasons' that might merit compassionate release." *McCoy*, 981 F.3d at 276.  But, in U.S.S.G. § 1B1.13, titled "Reduction in Term of Imprisonment under 18 U.S.C. § 3582(c)(1)(A) Policy Statement," the Sentencing Commission addressed the "extraordinary and compelling reasons" that might warrant compassionate release.  *See McCoy*, 981 F.3d at 276. The Sentencing Commission acted pursuant to 28 U.S.C. § 994(t), as well as § 994(a)(2)(C).  *McCoy*, 981 F.3d at 276. However, as the *McCoy* Court observed, the policy statement was issued in 2006 and was last updated in November 2018, prior to the enactment of the First Step Act in December 2018.  *Id.*

In particular, U.S.S.G. § 1B1.13 provides that, on motion by the Director of the BOP, the court may reduce a sentence where warranted by extraordinary or compelling reasons (§ 1B1.13(1)(A)); the defendant is at least 70 years old and has served at least 30 years in prison (§ 1B1.13(1)(B)); the defendant is not a danger to the safety of any other person or to the community (§ 1B1.13(2)); and the reduction is consistent with the policy statement. U.S.S.G. § 1B1.13(3).

The Application Notes to U.S.S.G. § 1B1.13 indicate that compassionate release may be based on circumstances involving illness, declining health, age, exceptional family circumstances, as well as "other reasons."  U.S.S.G.  § 1B1.13 App. Notes 1(A)-(D). Application Note 1 to U.S.S.G. § 1B1.13 defines "Extraordinary and Compelling Reasons" in part as follows:

> 1. **Extraordinary and Compelling Reasons**.—Provided the defendant meets the requirements of subdivision (2), extraordinary and compelling reasons exist under any of the circumstances set forth below:
>
> (A)    **Medical Condition of the Defendant**.—
>
> (i) The defendant is suffering from a terminal illness (*i.e.*, a serious and advanced illness with an end of life trajectory). A specific prognosis of life expectancy (*i.e.*, a probability of death within a specific time period) is not required. Examples include metastatic solid-tumor cancer, amyotrophic lateral sclerosis (ALS), end-stage organ disease, and advanced dementia.
>
> (ii) The defendant is—

(I)  suffering from a serious physical or medical condition,

(II) suffering from a serious functional or cognitive impairment, or

(III)  experiencing deteriorating physical or mental health because of the
aging process,

that substantially diminishes the ability of the defendant to provide self-care
within the environment of a correctional facility and from which he or she
is not expected to recover.

Application Note 1(B) provides that age is an extraordinary and compelling reason where
the defendant is at least 65 years of age, has serious physical or mental health issues, and has served
at least 10 years in prison or 75% of the sentence.  Application Note 1(C) concerns Family
Circumstances.  Application Note 1(D), titled "**Other Reasons**," permits the court to reduce
a sentence where, "[a]s determined by the Director of the Bureau of Prisons, there exists in the
defendant's case an extraordinary and compelling reason other than, or in combination with, the
reasons described in subdivisions (A) through (C)."  U.S.S.G. § 1B1.13 App. Note 1(D).  This is
the "so-called, 'catch-all' category."  *McCoy*, 981 F.3d at 276.

The  BOP  regulation  appears  at  Program  Statement  5050.50,  Compassionate
Release/Reduction in Sentence: Procedures for Implementation of 18 U.S.C. §§ 2582 and 4205.
However, the Court may not rely on the Program Statement.  Rather, the Court must consider the
Sentencing Commission's policy statements.  *United States v. Taylor*, 820 F. App'x 229, 229-30
(4th Cir. 2020) (per curiam) (citing 18 U.S.C. § 3582(c)(1)(A)); *see also* 28 U.S.C. § 994(t)
(directing Sentencing Commission to "describe what should be extraordinary and compelling
reasons for sentence reduction").

As noted, "[w]hen deciding whether to reduce a defendant's sentence under §
3582(c)(1)(A), a district court may grant a reduction only if it is 'consistent with applicable policy

6

statements issued by the Sentencing Commission.'"  *United States v. Taylor*, 820 F. App'x 229, 230 (4th Cir. 2020) (per curiam) (citing 18 U.S.C. § 3582(c)(1)(A)); *see also* 28 U.S.C. § 994(t) (directing Sentencing Commission to "describe what should be extraordinary and compelling reasons for sentence reduction").  However, as indicated, the policy statement in § 1B1.13 of the Guidelines was last updated in November 2018, before the enactment of the First Step Act.  Thus, it is only "directed at BOP requests for sentence reductions."  *McCoy*, 981 F.3d at 276 (citing U.S.S.G. § 1B1.13).  In other words, "[b]y its plain terms . . . § 1B1.13 does not apply to defendant-filed motions under § 3582(c)(1)(A)."  *Id.* at 282; *see also United States v. Roberto Brown*, __ F. App'x __, 2021 WL 3047185, at *1 (4th Cir. July 20, 2021); *United States v. Zullo*, 976 F.3d 228, 230 (2nd Cir. 2020); *United States v. Jones*, 980 F.3d 1098, 1108-12 (6th Cir. 2020); *United States v. Gunn*, 980 F.3d 1178, 1180-81 (7th Cir. 2020).

Accordingly, "[a]s of now, there is no Sentencing Commission policy statement 'applicable' to [] defendants' compassionate-release motions, which means that district courts need not conform, under § 3582(c)(1)(A)'s consistency requirement, to § 1B1.13 in determining whether there exist 'extraordinary and compelling reasons' for a sentence reduction."  *McCoy*, 981 F.3d at 283; *see Brown*, 2021 WL 3047185, at *1.  Therefore, district courts are "'empowered…to consider any extraordinary and compelling reason for release that a defendant might raise.'"  *McCoy*, 981 F.3d at 284 (quoting *Zullo*, 976 F.3d at 230).

Nevertheless, the defendant, as the movant, bears the burden of establishing that he is entitled to a sentence reduction under 18 U.S.C. § 3582.  *See*, *e.g.*, *United States v. Hamilton*, 715 F.3d 328, 337 (11th Cir. 2013); *United States v. Edwards*, NKM-17-00003, 2020 WL 1650406, at *3 (W.D. Va. Apr. 2, 2020).  If the defendant can show an extraordinary and compelling reason that renders him eligible for a sentence reduction, the Court must then consider the factors under 18 U.S.C. § 3553(a) to determine whether, in its discretion, a reduction of sentence is appropriate.

*Dillon*, 560 U.S. at 826-27; *see also United States v. Kibble*, 992 F.3d 326, 329-30 (4th Cir. 2021) (per curiam) (noting that district court must consider § 3553(a) factors when considering a motion to reduce sentence under § 3582(c)(1)(A) and district court enjoys broad discretion in conducting this analysis); *United States v. Trotman*, 829 Fed. App'x 607, 608-9 (4th Cir. 2020) (per curiam) (recognizing that, when considering a motion to reduce sentence under 18 U.S.C. § 3582(c)(1)(A), the court must consider the sentencing factors under 18 U.S.C. § 3553(a), to the extent applicable); *United States v. Chambliss*, 948 F.3d 691, 693-94 (5th Cir. 2020).   But, compassionate release is a "rare" remedy.  *United States v. Mangarella*, FDW-06-151, 2020 WL 1291835, at *2 (W.D. N.C. Mar. 16, 2020) (citation omitted); *see White v. United States*, 378 F. Supp. 3d 784, 787 (W.D. Mo. 2019).

### III.  COVID-19[2]

The World Health Organization declared COVID-19 a global pandemic on March 11, 2020.  *See Seth v. McDonough*, PX-20-1028, 2020 WL 2571168, at *1 (D. Md. May 21, 2020).[3] Defendant filed his motion for compassionate release in February 2021.  At that time, the nation was still "in the grip of a public health crisis more severe than any seen for a hundred years." *Antietam Battlefield KOA v. Hogan*, CCB-20-1130, 461 F. Supp. 3d 214, 223 (D. Md. 2020).

The judges of this Court "have written extensively about the pandemic."  *United States v. Williams*, PWG-19-134, 2020 WL 3073320, at *1 (D. Md. June 10, 2020) (collecting cases).

---

[2] The Court may take judicial notice of matters of public record.  *See* Fed. R. Evid. 201.

[3] Severe Acute Respiratory Syndrome Coronavirus 2 (SARS-CoV-2) is the cause of coronavirus disease 2019, commonly called COVID-19.  *See Naming the Coronavirus Disease and the Virus that Causes It*, WORLD HEALTH ORG., https://bit.ly/2UMC6uW  (last accessed June 15, 2020).

Therefore, it is not necessary to recount in detail the "unprecedented nature and impact" of the pandemic. *Id.*

That said, the Court must reiterate that the COVID-19 pandemic has been described as the worst public health crisis that the world has experienced since 1918. *See United States v. Hernandez*, 451 F. Supp. 3d 301, 305 (S.D.N.Y. 2020) ("The COVID-19 pandemic . . . . presents a clear and present danger to free society for reasons that need no elaboration."). Indeed, the pandemic "produced unparalleled and exceptional circumstances affecting every aspect of life as we have known it." *Cameron v. Bouchard*, LVP-20-10949, 2020 WL 2569868, at *1 (E.D. Mich. May 21, 2020), *vacated*, 815 F. App'x 978 (6th Cir. 2020). For a significant period of time, life as we have known it came to a halt.  For quite some time, businesses and schools were shuttered or operated on a limited basis.

The virus is highly contagious. *See Coronavirus Disease 2019 (COVID-19), How COVID-19 Spreads*, Cᴛʀs. Fᴏʀ Dɪsᴇᴀsᴇ Cᴏɴᴛʀᴏʟ & Pʀᴇᴠᴇɴᴛɪᴏɴ (Apr. 2, 2020), https://bit.ly/2XoiDDh. Many people who are stricken with the virus experience only mild or moderate symptoms.  But, the virus can cause severe medical problems as well as death, especially for those in "high-risk categories . . . ." *Antietam Battlefield KOA*, 461 F. Supp. 3d at 223 (citation omitted).

The virus continues to afflict those residing in countries around the world, particularly where large numbers of the population are unvaccinated.  In recent weeks, this country had begun to enjoy a reduction in the number of new cases, as compared to earlier periods.  However, throughout the country those numbers have again begun to rise, especially among the unvaccinated; about 51% of the total population remains unvaccinated.[4] *See How Vaccinations Are Going in Your County and State*, N.Y. Times,

---

[4] This number includes people who are not eligible for vaccination.

https://www.nytimes.com/interactive/2020/us/covid-19-vaccine-doses.html (last visited July 23, 2021). As of July 19, 2021, COVID-19 has infected more than 34 million Americans and caused approximately 609,000 deaths in this country. *See COVID-19 Dashboard*, The Johns Hopkins Univ., https://bit.ly/2WD4XU9 (last accessed July 19, 2021).

Of relevance here, the Centers for Disease Control and Prevention ("CDC") has identified certain risk factors that may increase the chance of severe illness due to the virus. Those risk factors initially included age (over 65); lung disease; asthma; chronic kidney disease; serious heart disease; obesity; diabetes; liver disease; and a compromised immune system. *See Coronavirus Disease 2019 (COVID-19), People Who Are at Risk for Severe Illness*, CTRS. FOR DISEASE CONTROL & PREVENTION (May 14, 2020), https://bit.ly/2WBcB16.

On June 25, 2020, July 17, 2020, and November 2, 2020, the CDC revised its guidance as to medical conditions that pose a greater risk of severe illness due to COVID-19. On March 29, 2021, to reflect the most recently available data, the CDC again revised its guidance. *See People with Certain Medical Conditions*, CTRS. FOR DISEASE CONTROL & PREVENTION (Mar. 29, 2021), https://bit.ly/38S4NfY. According to the CDC, the factors that increase the risk include cancer; chronic kidney disease; chronic lung diseases, including COPD, asthma (moderate to severe), interstitial lung disease, cystic fibrosis, and pulmonary hypertension; dementia or other neurological conditions; diabetes (Type 1 and Type 2); Down syndrome; heart conditions, such as heart failure, coronary artery disease, cardiomyopathies, and hypertension; HIV; being immunocompromised; liver disease; obesity, where the body mass index ("BMI") is 25 or higher; pregnancy; sickle cell disease; smoking; solid organ or blood stem cell transplant; stroke or cerebrovascular disease; and substance use disorders. *Id.* The CDC has also indicated that the risk for severe illness from COVID-19 increases with age, with older adults at highest risk. *See Older*

*Adults At Greater Risk of Requiring Hospitalization or Dying if Diagnosed with COVID-19*, CTRS. FOR DISEASE CONTROL & PREVENTION (Nov. 27, 2020), https://bit.ly/3g1USZ1.

To stem the spread of the virus, people were urged to practice "social distancing" and to wear masks. *See Coronavirus Disease 2019 (COVID-19), How to Protect Yourself & Others*, CTRS. FOR DISEASE CONTROL & PREVENTION, https://bit.ly/3dPA8Ba (last accessed December 9, 2020). Social distancing is particularly difficult in the penal setting, however. *Seth*, 2020 WL 2571168, at *2; *Senate Judiciary Hrg. Transcript on Incarceration during COVID-19*, REV.COM (June 2, 2020) (Testimony of BOP Dir. Michael Carvajal at 47:00) ("Prisons by design are not made for social distancing. They are on [sic] the opposite made to contain people in one area."). Indeed, prisoners have little ability to isolate themselves from the threat posed by the coronavirus. *Id*.; *see Cameron*, 2020 WL 2569868, at *1; *see also United States v. Mel*, TDC-18-0571, 2020 WL 2041674, at *3 (D. Md. Apr. 28, 2020) ("In light of the shared facilities, the difficulty of social distancing, and challenges relating to maintaining sanitation, the risk of infection and the spread of infection within prisons and detention facilities is particularly high."). Prisoners usually "share bathrooms, laundry and eating areas," and are often "bunked in the same cell" with several others. Amanda Klonsky, *An Epicenter of the Pandemic Will Be Jails and Prisons, if Inaction Continues*, N.Y. TIMES (Mar. 16, 2020).

To illustrate, prisoners are not readily able to secure safety products on their own to protect themselves, such as masks and hand sanitizers, nor are they necessarily able to separate or distance themselves from others. *See* Kim Bellware, *Prisoners and Guards Agree About Federal Coronavirus Response: 'We do Not Feel Safe,'* WASH. POST (Aug. 24, 2020) (reporting use of non-reusable masks for months and a lack of transparency around policies for personal protective equipment and testing). They do not get to decide where, when, or how to eat or sleep.

Consequently, correctional facilities are especially vulnerable to viral outbreaks and ill-suited to stem their spread.  *See Coreas v. Bounds*, TDC-20-0780, 2020 WL 1663133, at *2 (D. Md. Apr. 3, 2020) ("Prisons, jails, and detention centers are especially vulnerable to outbreaks of COVID-19."); *see also* Eddie Burkhalter et al., *Incarcerated and Infected: How the Virus Tore Through the U.S. Prison System*, N.Y. TIMES (Apr. 16, 2021) (stating that the "cramped, often unsanitary settings of correctional institutions have been ideal for incubating and transmitting the disease. Social distancing is often not an option."); Letter of 3/25/20 to Governor Hogan from approximately 15 members of Johns Hopkins faculty at the Bloomberg School of Public Health, School of Nursing, and School of Medicine (explaining that the "close quarters of jails and prisons, the inability to employ effective social distancing measures, and the many high-contact surfaces within facilities, make transmission of COVID-19 more likely"); *accord Brown v. Plata*, 563 U.S. 493, 519-20 (2011) (referencing a medical expert's description of the overcrowded California prison system as "'breeding grounds for disease'") (citation omitted).

On March 23, 2020, the CDC issued guidance for the operation of penal institutions to help prevent the spread of the virus.  *Seth*, 2020 WL 2571168, at *2.  Notably, the Bureau of Prisons ("BOP") implemented substantial measures to mitigate the risks to prisoners, to protect inmates from COVID-19, and to treat those who are infected.  Indeed, as the Third Circuit recognized in *United States v. Raia*, 954 F.3d 594, 597 (3rd Cir. 2020), the BOP has made "extensive and professional efforts to curtail the virus's spread."

The Department of Justice ("DOJ") recognized the unique risks posed to inmates and employees of the BOP from COVID-19.  The DOJ adopted the position that an inmate who presents with one of the risk factors identified by the CDC should be considered as having an

"extraordinary and compelling reason" warranting a sentence reduction.  *See* U.S.S.G. § 1B1.13 cmt. n.1(A)(ii)(I).

Former Attorney General William Barr issued a memorandum to Michael Carvajal, Director of the BOP, on March 26, 2020, instructing him to prioritize the use of home confinement for inmates at risk of complications from COVID-19.  *See Hallinan v. Scarantino*, 20-HC-2088-FL, 2020 WL 3105094, at *8 (E.D. N.C. June 11, 2020).  Then, on March 27, 2020, Congress passed the Coronavirus Aid, Relief, and Economic Security Act (the "CARES Act"), Pub. L. No. 116-136, 134 Stat. 281.  In relevant part, the CARES Act authorized the Director of BOP to extend the permissible length of home confinement, subject to a finding of an emergency by the Attorney General.  *See* Pub. L. No. 116-136, § 12003(b)(2).  On April 3, 2020, Attorney General Barr issued another memorandum to Carvajal, finding "the requisite emergency . . . ."  *Hallinan*, 2020 WL 3105094, at *9.  Notably, the April 3 memorandum "had the effect of expanding the [BOP's] authority to grant home confinement to any inmate . . . ."  *Id.*

Although there is currently no cure for the virus, medical treatments have continued to improve.  And, significantly, we have seen the rollout of three vaccines for COVID-19 (Pfizer, Moderna, and Johnson & Johnson).  Initially, the vaccines were made available to health care workers, the elderly in nursing homes, and first responders.  But, the vaccine is now available to all persons twelve years of age and older.  Approximately 56.6% of the eligible population, and 59.3% of all persons eighteen years of age and older, are fully vaccinated.  *See How Vaccinations Are Going in Your County and State*, N.Y. Times, https://www.nytimes.com/interactive/2020/us/covid-19-vaccine-doses.html (last visited July 19, 2021).  And, 48.4% of the total U.S. population is fully vaccinated.  *See id.*

Given the vaccine rollout, the BOP published "COVID-19 Vaccine Guidance" on January 4, 2021 (version 7.0). *COVID-19 Vaccine Guidance*, Federal Bureau of Prisons Clinical Guidance (Jan. 4, 2021), https://www.bop.gov/resources/pdfs/2021_covid19_vaccine.pdf. Administration of the COVID-19 vaccine (Pfizer and Moderna) will "align with [recommendations of] the Centers for Disease Control and Prevention." *Id.* at 4. Its plan was for prisoners at heightened risk to receive priority for the vaccine. *Id.* at 6.

The BOP reportedly received its first shipment of vaccines on December 16, 2020. Walter Pavlo, F*ederal Bureau of Prisons Starts Vaccination of Staff, Inmates Soon Thereafter*, Forbes (Dec. 21, 2020), https://www.forbes.com/sites/walterpavlo/2020/12/21/ federal-bureau-of-prisons-starts-vaccination-of-staff-inmates-soon-thereafter/?sh=5683b99aa96f. As of July 19, 2021, the BOP had 130,384 federal inmates and 36,000 staff. And, by that date, the BOP had administered 202,074 vaccine doses to staff and inmates. *See* https://www.bop.gov/coronavirus/ (last accessed July 19, 2021).[5]

---

[5] The *New York Times* reported in June 2020 that cases of COVID-19 "have soared in recent weeks" at jails and prisons across the country. Timothy Williams et al., *Coronavirus cases Rise Sharply in Prisons Even as They Plateau Nationwide*, N.Y. TIMES (June 18, 2020), https://nyti.ms/37JZgH2; *See Cases in Jails and Prisons*, N.Y. TIMES (Oct. 29, 2020) (On October 29, 2020, the *New York Times* reported that, "[i]n American jails and prisons, more than 252,000 people have been infected and at least 1,450 inmates and correctional officers have died" from COVID-19.). On November 21, 2020, the *New York Times* reported that "U.S. correctional facilities are experiencing record spikes in coronavirus infections this fall. During the week of Nov. 17, there were 13,657 new coronavirus infections reported across the state and federal prison systems.*" America Is Letting the Coronavirus Rage Through Prisons*, N.Y. TIMES (Nov. 21, 2020), https://www.nytimes.com/2020/11/21/opinion/sunday/coronavirus-prisons-jails.html.

More recently, on April 16, 2021, the *New York Times* reported that at least 39% of prisoners are known to have been infected in federal facilities. Eddie Burkhalter et al., *Incarcerated and Infected: How the Virus Tore Through the U.S. Prison System*, N.Y. TIMES (Apr. 10, 2021). And, according to the article, the actual count is most likely much higher "because of the dearth of testing." *Id.* Nevertheless, with the passage of time, the outbreaks of COVID-19 have declined.

As of July 19, 2021, BOP reported that 140 inmates out of a total of 129,459 inmates, and 113 BOP staff out of some 36,000 staff members, currently test positive for COVID-19; 43,528 inmates and 6,951 staff have recovered from the virus; and 240 inmates and four staff members have died from the virus.  Moreover, the BOP has completed 117,056 COVID-19 tests.  *See* https://www.bop.gov/coronavirus/, *supra*.

With respect to Coleman Low, where the defendant is imprisoned, the BOP reported that as of July 28, 2021, out of a total of 1,158 inmates, no inmates tested positive but five staff members have tested positive.  Moreover, 219 inmates and 46 staff have recovered at the facility. In addition, 547 staff members and 3,806 inmates at the Coleman complex have been inoculated with the vaccine.  *See* https://www.bop.gov/coronavirus/, Federal Bureau of Prisons, https://www.bop.gov/locations/institutions/alf/ (last visited July 28, 2021).

### IV.  Motion for Compassionate Release

Sinani has moved for compassionate release on the ground that his medical conditions render him particularly vulnerable to COVID-19.  ECF 426 at 1. In particular, he asserts that he suffers from Hepatitis B and "immune system deficiency from smoking." *Id.*

The government argues that defendant has not established an extraordinary and compelling reason for relief. ECF 433 at 13. In any event, the government maintains that Sinani remains a danger to the community and the § 3553(a) militate against granting his Motion. *Id.* at 14.

Sinani has not presented a medical condition identified by the CDC that places him at a risk for severe illness from the virus. In fact, according to Sinani's BOP medical records, as of October 2020 he did not have any medical conditions, including Hepatitis B and immune system deficiency. ECF 433-4 at 20-21. Further, defendant reported to be in good physical health prior to

sentencing. *See* ECF 326 (Presentence Report), ¶ 51.   Notably, he has not provided any documentation to establish a serious health condition.

In my view, Sinani has not established an extraordinary and compelling reason for relief under 18 U.S.C. § 3582. Accordingly, I need not address whether Sinani poses a danger to the community, or the factors set forth in 18 U.S.C. § 3553(a).

Nevertheless, even if I were to consider the factors under 18 U.S.C. § 3553(a), a reduction of Sinani's sentence would be inconsistent with those factors. Sinani was involved in a large-scale drug conspiracy. At trial, Sinani testified falsely about several matters, and also engaged in threatening conduct towards witnesses. ECF 326, ¶¶ 14-17.

In analyzing a motion for compassionate release, courts are to consider a defendant's post-sentencing conduct because it "provides the most up-to-date picture of [a defendant's] 'history and characteristics.'"   *See Pepper v. United States*, 562 U.S. 476, 492 (2011) (citing 18 U.S.C. § 3553(a)(1)) (considering the "extensive evidence of" defendant's rehabilitation since his initial sentencing under § 3553(a) analysis); *see also United States v. Scott*, CCB-95-202, 2020 WL 2467425, at *4 (D. Md. May 13, 2020); *cf. United States v. McDonald*, 986 F.3d 402 (4th Cir. 2021) (noting that on a motion to reduce sentence under the First Step Act, district court must consider defendant's post-sentencing conduct). Sinani has had multiple infractions in the short time he has been incarcerated. *See* ECF 433-3. This is of concern. Moreover, there is no indication that Sinani has accepted responsibility for his conduct, which could suggest that he is on the road to rehabilitation. These facts militate against granting Sinani a reduction in his sentence.

Additionally, Sinani has only served about 45% of his sentence. The sentence was a reasonable one, in that it was towards the bottom of the guidelines range..

## V.  Motion for Legal Documents

As noted, Sinani also filed a Motion for Legal Documents, requesting documents from his defense attorney, Paul Kramer, Esquire. ECF 437. Sinani asks for "his entire case file, including but not limited to all discovery materials, pretrial motions, responses, orders, plea offerings, statements that Movant give [sic] to the agents, search warrants, reports,  memos, Indictment(s), e-mails, notes, texts, and other confidential-or-not correspondence between the attorney and Movant, and/or the Government and/or any person related to this case." *Id.* at 1.

Mr. Kramer was privately retained.  He responded to Sinani's Motion for Legal Documents on March 26, 2021, noting that he could not share the documents with Sinani due to a discovery agreement with the United States Attorney's Office. ECF 438.

By Letter of March 29, 2021 (ECF 437), the Court directed Mr. Kramer to confer with the U.S. Attorney's Office to determine whether any of the requested documents could be safely disclosed. Moreover, I stated: "As to those documents that may be safely disclosed, I ask that you send them to Mr. Sinani in care of the Warden."  Thereafter, by letter of April 1, 2021 (ECF 440), the government explained that the requested documents could not be released because "there are significant safety concerns with regard to witnesses." *Id.* at 1-2. Further, the government noted that the Court has already adjudicated Sinani's post-conviction petition, and thus "there is no need for him to have the requested documents." *Id.* at 2.

I responded to the lawyers on the same date.  ECF 441.  I noted that the government's concerns were "quite sound."   *Id.* But, I reiterated that Mr. Kramer should confer with the government and reach an agreement, if possible, as to the particular documents that may be safely produced. *Id.*

Further, as discussed, the Court has already denied Sinani's motion for post-conviction relief. ECF 418; ECF 419. In any event, the Court has acted on Sinani's request by directing the attorneys to confer and reach an agreement, if possible, as to the particular documents that may be safely produced. *See* ECF 441.

## VI. Miscellaneous Motions

Sinani has also filed various other motions: Motion to Dismiss (ECF 443); Motion for Bond (ECF 444); Motion for Default Judgment (ECF 447); and Motion for Clerk's Default (ECF 450). Sinani contends that "he was never legally indicted by a Grand Jury in this instant case" and that the Court did not have subject matter jurisdiction to try and convict him. ECF 443 at 1. This contention is frivolous. Further, he posits that the "conviction is illegal" and violates "his Constitutionally protected civil right[s]." *Id.* at 2.

The Motion to Dismiss is little more than a blatant effort at an end run around the rule barring unauthorized, successive motions under 28 U.S.C. § 2255. Sinani has not requested permission from the United States Court of Appeals for the Fourth Circuit to file a successive post conviction motion under 28 U.S.C. § 2255, as required by § 2255(h).

Ordinarily, a federal defendant must bring a collateral attack on the legality of his conviction or sentence through a motion to vacate under 28 U.S.C. § 2255. Although Sinani labels the instant filing as a Motion to Dismiss, the label is not determinative; it is the substance that controls. The Motion to Dismiss is properly characterized as a motion to vacate, set aside, or correct sentence under 28 U.S.C. § 2255. *See Swain v. Pressley*, 430 U.S. 377-78 (1977); *In re Jones*, 226 F.3d 328, 332 (4th Cir. 2000).

In the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), which amended 28 U.S.C. § 2255, Congress imposed "stringent limitation[s] on a federal prisoner's ability to bring

a 'second or successive' post-conviction motion pursuant to § 2255." *United States v. Emanuel*, 288 F.3d 644, 647 (4th Cir. 2002). First, AEDPA requires that a successive § 2255 motion "must be certified...by a panel of the appropriate court of appeals..." 28 U.S.C. § 2255(h); *see also United States v. Poole*, 531 F.3d 263, 266 n.4 (4th Cir. 2008). Second, the court of appeals may only certify a successive § 2255 motion if the petitioner (1) has newly discovered evidence or (2) relies "on a new rule of constitutional law that the Supreme Court has made retroactively applicable to collateral proceedings." *Emmanuel*, 288 F.3d at 647; *see also* 28 U.S.C. § 2255(h).

As indicated, under 28 U.S.C. § 2255(h), the United States Court of Appeals for the Fourth Circuit must certify Sinani's entitlement to file a successive petition under 28 U.S.C. § 2255. Section 225(h) states:

> A second or successive motion must be certified as provided in § 2244 by a panel of the appropriate Court of Appeals to contain – (1) newly discovered evidence that, if proven in view of in light of the evidence as a whole, would be sufficient to establish a clear and convincing evidence that no reasonable fact finder would have found the movant guilty of the offense; or (2) a new rule of constitutional law, made retroactive to cases on collateral review by the Supreme Court, that was previously unavailable.

As noted, Sinani was previously denied relief under § 2255. Accordingly, before this Court may examine a successive motion on the merits, the Fourth Circuit must enter an order authorizing consideration of the successive petition. *See* § 2244(b)(3)(A); *Felker v. Turpin*, 518 U.S. 651, 664 (1996). It is clear that he cannot satisfy the threshold requirements of § 2255(h)(2) for a successive § 2255 motion because he has not obtained authorization from the Fourth Circuit for the filing of a successive petition. Without the requisite pre-filing authorization, "the district court lacks jurisdiction to consider a [successive] application..." *United States v. Winestock*, 340 F.3d 200, 205 (4th Cir. 2003); *see Evans v. Smith*, 220 F.3d 206, 325 (4th Cir. 2000); *In re Vial*, 115 F.3d 1192, 1194-95 (4th Cir. 1997).

Even if the Court were able to consider the merits, however, Sinani would not prevail. His claims are specious.

Sinani's effort to manufacture flaws in his indictment and conviction do not undercut the overwhelming evidence in favor of conviction. The convictions and sentence followed pretrial and trial proceedings that were entirely fair.

Therefore, I shall deny the Motion to Dismiss. And, because the Motion for Bond (ECF 444), Motion for Default Judgment (ECF 447), and Motion for Clerk's Default (ECF 450) are predicated on the viability of the Motion to Dismiss, I shall also deny those motions.

## VI. Certificate of Appealability

Pursuant to Rule 11(a) of the Rules Governing Proceedings under 28 U.S.C. § 2255, the court is required to issue or deny a certificate of appealability ("COA") when it enters a final order adverse to the applicant as to a post conviction claim. Because I have construed the Motion to Dismiss as a post conviction claim, I must determine whether to issue a COA.

A COA is a "jurisdictional prerequisite" to an appeal from the court's earlier order. *United States v. Hadden*, 475 F.3d 652, 659 (4th Cir. 2007). In other words, unless a COA is issued, a petitioner may not appeal the court's decision in a § 2255 proceeding. 28 U.S.C. § 2253(c)(1); Fed. R. App. P. 22(b).[6]

A COA may issue "only if the applicant has made a substantial showing of the denial of a constitutional right." 28 U.S.C. § 2253(c)(2); *see Buck v. Davis*, ___ U.S. ___, 137 S. Ct. at 773. Where the court denies a petitioner's motion on its merits, a petitioner satisfies this standard by demonstrating that reasonable jurists would find the court's assessment of the constitutional claims

---

[6] The denial of a COA by the district court does not preclude a petitioner from seeking a COA from the appellate court.

debatable or wrong. *See Tennard v. Dretke*, 542 U.S. 274, 282 (2004); *Slack v. McDaniel*, 529 U.S. 473, 484 (2000); *see also Miller-El v. Cockrell*, 537 U.S. 322, 336-38 (2003). As indicated, a COA may issue only if the petitioner "has made a substantial showing of the denial of a constitutional right." 28 U.S.C. § 2253(c)(2). Because Sinani has not made a substantial showing of the denial of his constitutional rights, I decline to issue a COA.

An Order follows, consistent with this Memorandum Opinion.

Date: July 29, 2021                                    _____/s/_____
                                                       Ellen L. Hollander
                                                       United States District Judge